■ Nandkumar Ramkumar, Appellant, v Grand Style Transportation Enterprises Inc. et al., Respondents. Grand Style Transportation Enterprises Inc. et al., Third-Party Plaintiffs, v Georgina D. Castillo, Third-Party Defendant-Respondent. [941 NYS2d 610]—

Order, Supreme Court, Bronx County (Kenneth L. Thompson,

Jr., J.), entered on or about July 1, 2010, which, to the extent appealed from as limited by the briefs, granted defendants' cross motions for summary judgment dismissing the complaint on the ground that plaintiff did not sustain a serious injury within the meaning of Insurance Law § 5102 (d), affirmed, without costs.

Defendants made a prima facie showing of entitlement to judgment as a matter of law. The differences in the defense experts' range-of-motion findings are minor and both doctors concluded that plaintiff's range of motion is normal (*see Feliz v Fragosa*, 85 AD3d 417, 418 [2011]).

In opposing defendants' motions, plaintiff failed to offer a reasonable explanation for a significant gap in his medical treatment that was raised by the Bissessar defendants when they cross-moved for summary judgment. As the Court of Appeals held in *Pommells v Perez* (4 NY3d 566 [2005]), "a plaintiff who terminates therapeutic measures following the accident, while claiming 'serious injury,' must offer some reasonable explanation for having done so" (*id.* at 574).

Plaintiff's accident occurred on April 8, 2007 and he underwent arthroscopic surgery on his right knee on June 29, 2007. As of July 5, 2007, plaintiff's orthopedic surgeon recommended physical therapy. When asked when he last received physical therapy, plaintiff testified that he was "cut off" five months before his July 2008 deposition. Therefore, the record gives no indication that plaintiff received any medical treatment during the 24-month period before he submitted answering papers to defendants' motions. We assume, as the dissent does, that there are limits to the amount of no-fault coverage for medical services such as physical therapy. The inquiry, however, does not end there. A bare assertion that insurance coverage for medically required treatment was exhausted is unavailing without any documentary evidence of such or, at least, an indication as to whether an injured claimant can afford to pay for the treatment out of his or her own funds (*see e.g. Gomez v Ford Motor Credit Co.*, 10 Misc 3d 900, 903 [Sup Ct, Bronx County 2005]; *see also Salman v Rosario*, 87 AD3d 482 [2011]; *Jacobs v Rolon*, 76 AD3d 905 [2010]). Plaintiff, who was employed and living with his parents, gave no such indication. Also, the dissent's theory that "[i]njuries are not always treatable by physical therapy" is speculative and finds no support in the record. Concur—Friedman, Renwick and DeGrasse, JJ.

Saxe, J.P., and Freedman, J., dissent in a memorandum by Saxe, J.P., as follows: Although the motion court dismissed plaintiff's serious injury claims on the ground that his physi-

cian's measurements of plaintiff's range-of-motion limitations were not made contemporaneously with the accident, the majority affirms the dismissal based on different reasoning, namely, what it deems to be an insufficiently-explained cessation of treatment. In view of plaintiff's assertion that he ceased ongoing therapy when his no-fault benefits for that service ceased, I believe it is error to affirm the dismissal of plaintiff's claims on that ground. I strenuously disagree with the majority's assertion that in order to be entitled to proceed with his serious injury claims, plaintiff had an affirmative obligation to explain why he could not afford to pay out of pocket for his continued therapy after his no-fault benefits stopped covering his therapy.

On April 8, 2007, plaintiff Nandkumar Ramkumar, then 23 years old, was a passenger in an automobile owned by defendant Bisnath Bissessar and operated by codefendant Danish Bissessar, when their car collided with another automobile owned by defendant Grand Style Transportation Enterprises Inc. and operated by defendant Ibrahim S. Tandia. Plaintiff was taken by ambulance to a nearby hospital emergency room where he was diagnosed with soft tissue injury, prescribed ibuprofen and released.

He sought treatment the next day, April 9, 2007, at Liberty Advanced Medical, P.C., complaining of severe neck pain, lower back pain and pain in his right knee. Dr. William Mejia diagnosed him with cervical and lumbar sprain and strain, and post-traumatic injury to the right knee, and prescribed a course of physical therapy, with MRIs to be performed if the symptoms persisted. On May 25, 2007, an MRI of plaintiff's lumbar spine was performed, and a left foraminal herniation was found at L3-4, and a central disc herniation was found at L4-5. On June 20, 2007, an MRI was performed on his right knee, revealing a tear of the lateral meniscus, involving both the anterior and posterior horns. Arthroscopic surgery was performed on plaintiff's knee by Dr. Mehran Manouel on June 29, 2007. Plaintiff alleges that he was confined to bed for two days in April 2007 and for seven days in June and July 2007 "and intermittently thereafter."

Plaintiff commenced this action on or about July 10, 2007, alleging that the accident resulted in tears to his right meniscus, and injuries to his shoulders, cervical spine and lumbar spine, including herniated discs at L3-4 and L4-5.

Defendants moved for summary judgment, contending that plaintiff cannot establish that he suffered a serious injury as defined by Insurance Law § 5102 (d). They relied on the reports of three experts: two orthopedists and a radiologist.

Although their experts' findings satisfied defendants' burden of making a prima facie showing of entitlement to summary judgment (*see Feliz v Fragosa*, 85 AD3d 417, 418 [2011]), the evidence offered in response by plaintiff created an issue of fact as to whether plaintiff's injuries constituted serious injuries that were causally related to the accident, at the very least, with regard to the injuries to his right knee.

The affirmation by plaintiff's surgeon, Dr. Manouel, emphasized that based on his direct observations of plaintiff's knee during the surgery and the photographs taken at the time of the surgery, the injury—a large flap and radial shaped tear on the anterior and middle horn—was unmistakable, consistent with the described accident, and explained plaintiff's complaints of recurrent knee pain that began only after the accident and continued consistently since then. He added that causality was apparent since plaintiff was a young man with no history of knee injury or previous complaints of knee pain. He further stated that the torn meniscus "is by definition a permanent injury in that the tear or fissure of the meniscus can never spontaneously heal by itself without surgical intervention. Furthermore, once surgically repaired, *the meniscus has permanently lost its pre-injury stability with onset of scar tissue, instability and loss of range of motion and strength, with pain, all of which Mr. Ramkumar now has and will continue to have for the rest of his life*" (emphasis added). He went on to explain the nature of the permanent injury in greater detail: "Due to the mechanism of trauma he has sustained in this accident, there was a tearing of the right knee muscles, tendons, ligaments, blood vessels and nerves. These structures heal by formation of scar tissue, which is relatively inelastic and permanent in nature and causes significant restriction of motions, limitations of activities and pain." In addition, in his examination of plaintiff on May 4, 2009, Dr. Manouel found significant limitations in plaintiff's range of motion in flexion in his knee, as well as some continued limitations of motion in his lumbar spine and shoulder.

The motion court granted defendants' cross motions for summary judgment, concluding that plaintiff failed to satisfy his evidentiary burden of submitting objective medical proof of serious injury causally related to the accident, by failing to offer a *contemporaneous* examination showing limitations in plaintiff's range of motion, or the necessary objective evidence of the significant limitations resulting from the meniscal tear. It also held that a lack of evidence that plaintiff underwent any therapy or treatment required dismissal. The majority affirms on the

ground that plaintiff failed to sufficiently explain his cessation of therapeutic treatment.

I respectfully dissent with regard to plaintiff's serious injury claims (other than his 90/180 claim—as to which I agree that he failed to offer the requisite proof to support the claim).

Serious injury may be established under Insurance Law § 5102 (d) by a "permanent consequential limitation of use of a body organ or member" or a "significant limitation of use of a body function or system." Establishing that a plaintiff suffered a torn meniscus, or a bulging or herniated disc, as a result of the occurrence, is not enough. These types of soft-tissue injury *may* constitute serious injuries within the meaning of the statute, but only if the necessary showing of objective evidence establishing that the injury resulted in significant physical limitations of significant duration is made by the plaintiff (*see Bamundo v Fiero*, 88 AD3d 831 [2d Dept 2011]; *Colon v Vincent Plumbing & Mech. Co.*, 85 AD3d 541 [1st Dept 2011]).

In *Toure v Avis Rent A Car Sys.* (98 NY2d 345, 350-351 [2002]), the Court of Appeals wrote that, in "order to prove the extent or degree of physical limitation," plaintiff can provide either "an expert's designation of a numeric percentage of a plaintiff's loss of range of motion," or "[a]n expert's *qualitative* assessment of a plaintiff's condition," provided that such evaluation "has an objective basis and compares the plaintiff's limitations to the normal function, purpose and use of the affected body organ, member, function or system," so that it "can be tested during cross-examination, challenged by another expert and weighed by the trier of fact." While Dr. Manouel did not initially perform quantified range of motion testing, he tendered a "qualitative assessment" of plaintiff's meniscal injuries, reporting that plaintiff experienced pain, buckling and popping of the knee, and that the knee continued to have functional limitations after surgery. Moreover, his assessment was supported by objective evidence, namely, the MRI of the knee and the observations during the arthroscopic surgery establishing the existence of the tear, as well as the McMurray test that was performed.

Plaintiff adequately rebutted the assertion by defendants' experts that plaintiff's injuries were degenerative rather than caused by the accident (*see Spencer v Golden Eagle, Inc.*, 82 AD3d 589 [2011]). Plaintiff's radiologist specifically stated that there was no indication of any degenerative condition present when he read the films, and plaintiff's surgeon asserted that in view of plaintiff's age, the absence of any prior complaints, and the nature of the injuries found in MRIs performed weeks after

the accident, the subject accident was the sole competent producing cause of plaintiff's injuries.

It was error to reject Dr. Manouel's measurements of plaintiff's limitations in his range of motion in the injured areas simply because those measurements were made in his follow-up examination on May 4, 2009, two years after the accident, and were not "contemporaneous" with the accident. The Court of Appeals explained in *Perl v Meher* (18 NY3d 208 [2011]), that there is no justification for imposing a requirement of "contemporaneous" quantitative measurements, since while "a contemporaneous doctor's report is important to proof of *causation* [because] an examination by a doctor years later cannot reliably connect the symptoms with the accident . . . where causation is proved, it is not unreasonable to measure the *severity* of the injuries at a later time" (*id.* at 217-218). Here, there is strong evidence causally connecting the injuries to the accident, so the measurements of limitations taken two years later are valid evidence that plaintiff experienced continuing significant limitations due to his injuries. The surgeon's quantification of limitations in plaintiff's range of motion of the knee two years after the accident is therefore sufficient.

In my estimation, the majority's reliance on a so-called cessation of treatment is misplaced here. Injuries are not always treatable by physical therapy, but even when therapy might help, sometimes the medical coverage of injured plaintiffs limits them to a set number of weeks or sessions or physical therapy, leaving them no choice but to cease treatment. Here, for instance, plaintiff testified during his July 2008 deposition that he had no medical insurance at the time of the accident, that he obtained treatment at the Liberty Medical clinic after this accident, received therapy three days a week for "more than six months," but in response to the question of when he was last treated at the Liberty Medical clinic, he answered "they cut me off like five months," although he added that he did have a subsequent follow-up appointment with Dr. Manouel, whose orthopedic practice was located elsewhere.

In *Pommells v Perez* (4 NY3d 566, 574 [2005]), the Court explained that "[w]hile a cessation of treatment is not dispositive—the law surely does not require a record of needless treatment in order to survive summary judgment—a plaintiff who terminates therapeutic measures following the accident, while claiming 'serious injury,' must offer some reasonable explanation for having done so." In the *Pommells* matter, the Court held that dismissal was proper because *neither* the plaintiff *nor* his doctors explained why he did not pursue any treatment for

his injuries after the initial six-month period (*id.*), while in the related matter of *Brown v Dunlap*, the gap of 2¹/₂ years during which that plaintiff received no treatment for his injuries was explained by his doctor, who said he terminated treatment once he determined further medical therapy would be only palliative in nature (*id.* at 577). Here, the necessary explanation was offered by plaintiff when he said, perhaps unartfully, that his benefits were "cut off" at some point.

The majority suggests that a plaintiff cannot satisfactorily explain the cessation of treatment solely with the information that insurance coverage for continued therapy had ceased. It holds that the plaintiff must offer documentary evidence, "or, at least, an indication as to whether an injured claimant can afford to pay for the treatment out of his or her own funds." This proposal engrafts a new requirement onto our jurisprudence in the area of serious injury under Insurance Law § 5102 (d), one that is not justified by the language of *Pommells v Perez*.

In support of imposing such an obligation on plaintiff, the majority cites *Salman v Rosario* (87 AD3d 482 [2011]) and *Jacobs v Rolon* (76 AD3d 905 [2010]), in which this Court accepted the explanations provided by the plaintiffs that once their no-fault benefits stopped, they could not afford to pay for continued medical care. There is nothing incorrect about these rulings, but they were never intended to establish the minimum acceptable explanation as contemplated in *Pommells v Perez*.

Also offered in support for the majority's ruling is a lower court decision in *Gomez v Ford Motor Credit Co.* (10 Misc 3d 900, 903 [Sup Ct, Bronx County 2005]). The court in *Gomez* analyzed the requirements set out in *Pommells v Perez* and concluded that a plaintiff's burden of explaining a gap or cessation in treatment was not satisfied by the explanation that no-fault benefits had been discontinued. The court there held that the plaintiff was required to submit substantiation for the assertion that no-fault benefits were discontinued, adding that "[a]t the very least, counsel for plaintiff should have provided a letter from the insurance carrier as to when and why the carrier discontinued coverage" (*id.*). It termed an unsubstantiated claim "conclusory and nonprobative" (*id.*). It then went even further, blaming the plaintiff for failing to "provide[ ] an explanation as to why he could not have continued treatment paid out of his own pocket" (*id.*).

This proposed requirement in *Gomez* of "substantiation" of the plaintiff's explanation for the cessation of treatment would engraft onto section 5102 (d) an unfair and unreasonable standard of proof. Anyone who has ever dealt with no-fault carriers

would understand the likely futility of obtaining the suggested letter from them. The onerous nature of the *Gomez* requirements is highlighted by the companion requirement suggested there—one that seems to be adopted by the majority here—requiring a plaintiff to "explain" why he could not have paid out of pocket to continue his treatment when insurance benefits terminated. If we were to adopt such a requirement, a plaintiff with a substantial, lasting injury that was not healed during the course of the covered therapeutic treatment, would not be entitled to proceed with a lawsuit unless and until the plaintiff either dug deep into savings to pay for continued therapeutic treatment, or explained why his or her financial circumstances did not permit it. Indeed, consistent with *Gomez*'s proposed "substantiation" requirement, proof of the plaintiff's financial condition would be necessary.

The fact of the matter is that for most people, when insurance coverage ends, treatment ends. Very few people have the means to pay the substantial fees that the uninsured are charged for medical care. People who are employed have regular expenses on which they must spend their earnings; even people with savings most often have plans for the use of those funds. The right to sue for a serious injury cannot be predicated on the plaintiff paying those substantial fees out of pocket, assuming that the funds exist.

*Pommells v Perez* requires only that a plaintiff who claims that an injury remains after terminating treatment for it "must offer some reasonable explanation for having done so" (4 NY3d at 574). It does not treat such an explanation as conclusory or nonprobative in the absence of corroborating documentation. I therefore disagree with the majority's ruling that a reasonable explanation for a gap in treatment due to a cessation of insurance benefits must include documentation or a showing as to whether the plaintiff can afford to pay for the treatment out of pocket.

I would reinstate plaintiff's serious injury claims.